WALLACE, Judge,
dissenting.
I respectfully dissent. Speaking generally, it is apparent that procedural maneuvering of the sort pursued by the defense in this case — the addition of one or more Fabre defendants on the eve of trial and the withdrawal of the Fabre defense just before the submission of the case to the *185 jury — could be calculated to sow confusion among jurors and to unfairly disadvantage a plaintiff in the presentation of his or her case.[5] However, a review of the record in this case convinces me that the trial judge could 'have reasonably concluded that Edwards was not placed at an unfair disadvantage in the presentation of his case as a result of the “gamesmanship” criticized by the majority. An explanation of this point requires a brief statement of the pertinent facts and the theory underlying Edwards’ claim against Dr. Rosen for alleged medical malpractice.
Mrs. Edwards was hospitalized for a pulmonary embolism. During her hospitalization, Dr. Faruque, a hospitalist, was the primary manager of Mrs. Edwards’ care and treatment. Dr. Faruque placed Mrs. Edwards on a low-dose, regimen of heparin, an anti-coagulant. To assist her in managing Mrs. Edwards’ care, Dr. Fa-ruque called in a number of specialists. These specialists included, but were • not limited to, the following doctors: Dr. Juda, a critical care physician; Dr. Scott, an intensivist; and Dr. Rosen, a cardiologist. Mrs. Edwards did not recover, and she died in the hospital as a result of the pulmonary embolism. When she died, Mrs. Edwards was only forty years old.
According to Edwards and his expert witnesses, the heparin dosage that Dr. Fa-ruque had ordered for Mrs. Edwards was too low to be therapeutic. Edwards maintained that the other doctors called in by Dr. Faruque to assist her were aware that the treatment plan for Mrs. Edwards was inadequate, but none of them informed Dr. Faruque of this or suggested alternative treatments that would have been effective. Dr. Faruque relied on Dr. Rosen for a cardiac consultation regarding Mrs. Edwards. Edwards’ claim against Dr. Rosen was based on the theory that he knew or should have known - that Dr. Faruque’s treatment plan was inadequate and ineffective, but he failed to communicate this to Dr. Faruque and the other doctors and to recommend alternative treatments that would have been effective. Edwards maintained.that Dr.,-Rosen's involvement with Mrs. Edwards’ treatment breached the applicable standard of care. Edwards had made similar claims against the other specialists involved in .Mrs. Edwards’ care. Thus a claim that Dr. Faruque and the other doctors were negligent in connection with the care and treatment of Mrs. Edwards was inseparable from Edwards’ claim against Dr. Rosen. Indeed, before the amendment involving Dr. Scott and Dr. Juda made on the eve of trial, Dr. Rosen had already raised a Fabre defense naming Dr. Faruque. , .
As the majority notes, Edwards claimed “that he would have presented his case differently if Dr. Rosen was not going to place the Fabre defendants [Dr. Scott and Dr. Juda] on the verdict form.” However, Edwards’ theory of the case against Dr. Rosen remained consistent throughout the pretrial proceedings and the trial. For example, in her opening statement at trial, Edwards’ counsel told the jury that Dr. Rosen
needed to make a recommendation for either an IVC filter or full-dose heparin. Dr. Rosen should have followed up with *186 this patient the next day. He sees her on March 14th and never sees her again. He should have seen her on March 15th and, again, communicated with Dr. Fa-ruque, Dr. Scott[,] and Dr. Juda—
In her closing remarks to the jury, after the last-minute withdrawal of the Fabre defense, Edwards’ counsel made a similar argument supporting a breach of the standard of care by Dr. Rosen based on his failure to call to the attention of Dr. Fa-ruque and the other doctors involved with Mrs. Edwards’ care the inadequacy of the treatment plan:
Who on March 14 was in the best position to have these treatment option discussions with Dr. Faruque and Dr. Juda? It was Dr. Rosen; We know that she was receiving on March 14, 2008[,] low-dose heparin. And we heard testimony that Dr. [Richard Alexander Mat-thay] and Dr. [J. Michael] Gaziano criticized that method of treatment. It wasn’t enough. It wasn’t getting the PTT [partial thromboplastin time] therapeutic, meaning that thé heparin wasn’t being effective for Mary Edwards.
In support of the claim against Dr. Rosen for his omission to correct the alleged failures by the other members of the team of physicians involved with the care and treatment of Mrs. Edwards, the argument made by Edwards’ counsel focused on Dr. Rosen’s alleged failure to communicate to the other members of the team treating Mrs. Edwards the inadequacy of the treatment plan being followed and the necessity to pursue other options to save Mrs. Edwards’ life:
What would it have taken for Dr. Rosen to have these conversations [with the other doctors]? All he had to do was either pick up the phone, find Dr. Fa-ruque in the hospital,'find Dr. Juda in the ICU, or if you can’t, then document it on the echocardiogram report, document it in the consult note.... Tell them, “Hey listen, we’ve got a serious situation.. We’ve got to .consider these treatment options and list them out”, because Dr. Rosen was familiar with all of those treatment options_[I]t’s incumbent on the cardiologist according to my experts to be actively engaged in the suggestion with Dr. Faruque and Dr. Juda as to what to do to save Mary Edwards_ [Dr. Rosen] was in the best position to say something to Dr. Faruque and Dr. Juda.... Either discuss changing the heparin, which according to the plaintiffs experts more likely than not would have saved her life, or if not place an IVC filter, which more likely than not would have saved Mary Edwards’ life according to plaintiffs expert.
In light'of these facts, I disagree with the majority’s claim that “Edwards presented evidence that all of the treating physicians were negligent in their treatment of Mrs. Edwards in reliance on the fact that Dr. Rosen had pleaded the affirmative defense that the other doctors were negligent.” (Emphasis added.) Edwards’ claim of sueh “reliance” is not supported by his theory of the case. Dr. Rosen could not have breached the applicable standard of care if the low-dose heparin regime ordered by Dr. Faruque and.approved by Dr. Scott and Dr. Juda was adequate and effective. To establish his claim against Dr. Rosen, Edwards was required to prove that the other doctors had also breached the applicable standard of care.
For this reason, the trial judge could have rejected as unpersuasive Edwards’ claim that the addition to the case of Dr. Scott and Dr. Juda as Fabre defendants on the eve of trial and the subsequent withdrawal of the Fabre defense put him at an unfair disadvantage in the presentation of his case. We should also bear in mind that this case involved a complex claim of medical malpractice with multiple dueling experts in a trial that lasted for six days. *187 The trial judge was in a much better position than we are to determine the impact on the jury of Dr. Rosen’s asserted “gamesmanship” and the extent, if any, to which Edwards was unfairly prejudiced in the presentation of his case. See Cloud v. Fallis, 110 So.2d 669, 673 (Fla.1959). Because I cannot say that no reasonable judge would have reached the conclusion that Edwards received a fair trial despite Dr. Rosen’s procedural maneuvering, I would affirm. “The appellate court should apply the reasonableness test to determine whether the trial judge abused his discretion, to wit, ‘discretion is abused only where no reasonable [person] would take the view adopted by the trial court.’ ” Allstate Ins. Co. v. Manasse, 707 So.2d 1110, 1111 (Fla.1998) (quoting Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).

. Cf. D’Angelo v. Fitzmaurice, 863 So.2d 311, 312 n. 2 (Fla.2003) (noting that the defendant's withdrawal of a Fabre defense “was a strategic decision”). To the extent that defendants are employing machinations of this sort in the Florida courts to abuse the jury trial process, it might be appropriate to adopt an amendment to the civil rules that would prohibit a defendant from withdrawing a Fabre defense without the consent of all parties once a jury is sworn to try the case. Absent such a procedural innovation, the trial courts of this state are best equipped to address any such problem through the entry of detailed pretrial orders and the strict enforcement of them thereafter.